# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 1:14-cr-324 |
| | : | |
| Plaintiff, | : | Hon. John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| TIMOTHY P. FOSTER, | : | |
| JAY FINDLING, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM & ORDER

### July 22, 2016

Defendant Jay Findling, (hereafter "Findling"), pled guilty on February 10, 2015, to Count 1 of a two-count Information that charged him with conspiracy to commit wire fraud against Rite Aid Corporation, ("Rite Aid)," in violation of 18 U.S.C. § 371. Findling committed this conspiracy with Defendant Timothy Foster, who was at the time Vice President for Quality Assurance for Rite Aid. Foster pled guilty to Count 2 of the Information on February 10, 2015, which charged him with making false statements to the Government, in violation of 18 U.S.C. § 1001(a)(2).

Presently pending before the Court are Defendants' objections to numerous paragraphs in their Presentence Reports concerning the loss amount in the instant matter. As we shall detail in this Memorandum, the Defendants' and the Government's proposed loss amount are worlds apart.

A three day evidentiary hearing was held over February 22-24, 2016, during which the Defendants and the Government had the opportunity to present evidence and experts on the issue of the appropriate loss amount in this matter.

After the hearing, the parties fully briefed their positions on the loss amount.[1] (Docs. 92, 93, 94, 96). Thus, Defendants' objections to the loss amount contained in their PSRs are ripe for our review, and we are presented with the monumental task of reconciling totally different views as to what in fact was lost.

## I.   BACKGROUND

The following factual summary of the offense is taken from Foster's Presentence Report. The defense does not dispute these facts in their post-hearing briefs.

From 2001 to 2010, Foster and Findling engaged in a conspiracy to defraud Rite Aid via a surplus inventory sales/kickback scheme. Their fraudulent scheme succeeded by making Rite Aid believe its surplus inventory had been sold to

---

[1] Findling filed a motion to strike the Government's initial post-hearing brief because it contained new evidence that had not been offered at trial. (Doc. 85). We granted in part and denied in part Findling's motion to strike. (Doc. 90). With the Court's permission, Findling then chose to file a new brief that had excised reference to the newly offered evidence.

Findling's company, J. Finn Industries, for certain amounts reported by Foster when, in fact, the inventory had been sold to third party buyers for more money. (Foster PSR, Doc. 39, ¶ 4).

"Upon Foster's direction and assistance, in or about March 2001, Findling opened a bank account under the name of J. Finn Industries, d/b/a 'Rite Aid Salvage Liquidation,' at Citibank in New Jersey. The account was solely controlled by Findling. Rite Aid was unaware of the account's existence." (*Id.*, ¶ 7).

In some transactions with third party buyers, Findling's role was limited to logistical support. (*Id.*, ¶ 8). "If Foster negotiated the sale of the inventory, he would send the buyer a Rite Aid invoice directing the buyer to wire payment" to the Rite Aid Salvage Liquidation account controlled by Findling. (*Id.*, ¶ 9).

"If Findling negotiated the sale of the inventory, he would send the buyer a J. Findling Industries invoice and deposit the payment, wire transfer or check, into a J. Findling Industries bank account. Findling would then report the amount of the actual purchase price to Foster." (*Id.*, ¶ 10).

"Foster would then send an e-mail to Rite Aid's Treasury Department advising the inventory had been sold, not for the actual purchase price, but for a false, lower price." (*Id.*, ¶ 11). Foster would then send Findling a "bogus Rite Aid invoice reflecting the sale of the inventory to their companies at the false, low

price. In order to keep track of the real price obtained for the goods, Foster would disguise the real purchase price as the invoice number." (*Id.*, ¶ 12).

Findling would then move the funds from his "Rite Aid" account to his J. Finn Industries account, and then send wire transfer from that account to Rite Aid in the false amount indicated on the invoice. (*Id.*, ¶ 13).

In these transactions, the Government and Defendants dispute whether Findling is best characterized as acting as a liquidator or as a broker. We will comprehensively discuss this issue in the Discussion portion of our Memorandum.

The Government's position is that the total loss sustained by Rite Aid as a result of Foster's fraudulent surplus inventory sales/kickback schemes is $31,493,847. This number represents the combined loss amount from both the scheme Foster had with Findling and a similar type of scheme he conducted with another person, Joshua Baser, who is not a codefendant in the instant matter.[2] Of this total amount, the Government asserts that the loss attributable to the Foster/Findling scheme is $29,725,082.

In stark contrast, Findling's position is that Rite Aid in fact suffered *no* loss at all. His position is that Rite Aid's return on the surplus inventory he sold for them was fair. Foster concedes that the money which he took in the form of

_____

[2] Baser entered into a non-prosecution agreement with the Government on March 13, 2013, in exchange for his cooperation and a payment of $500,000 in restitution to Rite Aid. (Doc. 39, p. 5).

kickbacks from Findling, totaling approximately $5.7 million, is a loss to Rite Aid. However, Foster also maintains that the Government's asserted loss amount is grossly inaccurate because it fails to take into account the value of the services provided by Findling and his company to Rite Aid in liquidating its surplus inventory.

## II.     EVIDENCE PRESENTED AT HEARING

### A.     Evidence Offered by the Government

#### 1.     David Clark

The Government presented an extensive amount of evidence cataloguing each transaction in which Findling engaged as part of the surplus inventory sales/ kickback schemes. The Government first presented the testimony of David Clark. Since August of 2014, Clark has worked, on a contractor employee basis, as a litigation financial analyst for the U.S. Attorney's Office. (Transc. 1, p.8). Prior to this role, Clark served as an FBI special agent for twenty-six years. (*Id.*). He is also a certified fraud examiner. (*Id.*, p. 10).

In his role as a litigation financial analyst, Clark was charged with ascertaining the loss to Rite Aid due to the Defendants' fraud. After spending "hundreds of hours" reviewing over 600,000 pages of business records, Clark testified that the records showed Findling received a gross payment of at least $132,301,514 on approximately 1,184 Rite Aid surplus inventory sales transactions

between June 2001 and January 2010. (*Id.*, pp. 13, 15, 19, 26). Clark referred to

this as the "minimum amount" Findling received on those transactions. Clark

further testified that the data showed only $102,576,432 had been paid to Rite Aid

from the sale of the inventory goods out of the gross amount received. (*Id.*, p. 26).

Thus, Clark testified that the difference between those two numbers is the total loss

amount to Rite Aid: $29,725,082. (*Id.*). This amount equates to approximately 23%

of the gross sales receipts. (*Id.*).

Clark organized this data concerning the transactions into a Summary Chart.

(Gov. Ex. #1). The Government also offered into evidence multiple sets of invoices

and checks that explained how Clark was able to calculate the loss. (Gov. Exs. #2,

#3, #4, and #5).

Additionally, Clark authenticated Government's Exhibit #6, a summary

chart supported by pages of "settle-up" sheets Foster faxed to Findling prior to the

"settle-up" meetings they had. This summary chart shows that Findling paid Foster

$5,741,495 between July 2001 and August 2009 as his share of the scheme. (Gov.

Ex. #6). Clark also authenticated Government's Exhibit #9, another summary chart

showing Findling's share of the extra money from the inventory sales not remitted

to Rite Aid to total $23,983,587.

Clark further testified that based on the invoices and other business

documents Rite Aid received, Rite Aid was made to believe Findling was

purchasing all of its inventory when in fact the inventory had been sold to third

party buyers. (Trans. 1, p. 20). He also stated that in every transaction he could

recall, Findling first sold the inventory to a third party, and received payment, prior

to remitting any payment back to Rite Aid. (*Id.*, p. 29).

Clark also testified that it was generally the third party buyer's responsibility

to pay for shipping expenses from the Rite Aid warehouses where the surplus

inventory was located. (*Id.*, p. 35).

Lastly, Clark authenticated Government's Exhibit #7, which summarizes the

Baser/Foster kickback payments. The chart shows that Rite Aid lost sales proceeds

amounting to $1,768,765 due to the Baser/Foster scheme. According to these

records, Baser's share of the "skim" was $904,980 and Foster's share was

$863,785. Adding this amount to the loss amount resulting from the

Foster/Findling scheme, Clark testified that the total loss amount to Rite Aid was

approximately $31 million. (Trans. 1, p. 64). Specifically, based on the summary

charts, the total loss amount then comes to $31,493,847.

### 2.   Cheryl Hoffman

Cheryl Hoffman was employed by Rite Aid as a senior manager of inventory

returns accounting and then as Director of Returns Inventory Operations until

November of 2010. (Trans. 3, p. 8). Findling first called her as a witness on the

second day of the hearing. Then, the Government called her as a witness on the third day of the hearing.

During her tenure, Hoffman supervised Rite Aid's third-party processors, or, as the Government explained, "the people that sorted and categorized and packaged up Rite Aid's surplus goods at their various facilities." (*Id.*). Rite Aid paid these third party companies fees and expenses for the work they performed. (*Id.*, p. 9). Hoffman testified that, on average, Rite Aid paid a third party about $12 million a year in scanning fees. (*Id.*, p. 12). They would also pay other types of fees to these third parties, such as pallet storage fees when pallets of product were not moved from the facility within a certain amount of time. (*Id.*, p. 13). Based on Hoffman's testimony, it appears that the warehouses where this inventory was stored were owned by the third party processors, not by Rite Aid or J. Finn Industries. (*Id.*).

As will be detailed later in our Memorandum, Defendants presented testimony that Findling's efforts with these third party processors added value to Rite Aid in the form of improving the liquidation process. Hoffman flatly disagreed. (*Id.*, p. 10). She instead testified that the new processes introduced by Findling to the liquidation process actually slowed down the process and made it less efficient. (*Id.*, p. 11). In fact, Hoffman testified, based on conversations she had with one of her third party processors, that Findling did not actually do all that

much in managing and processing the surplus inventory. She testified that he would "periodically visit" one of the main third party processor warehouses, and that when he would visit, it led to a "chaotic environment" in which he would try to change how the third party was doing the scanning and sorting process. (*Id.*, p. 16). When Rite Aid opened up a similar liquidation facility in Carlisle[3], Hoffman instructed the third party operating there that she should be called whenever Findling came on the premises so she could basically contain and manage how disruptive he was to the process. (*Id.*, p. 17).

However, upon questioning by defense counsel, Hoffman testified that after Findling was no longer involved with Rite Aid, Rite Aid had to hire another company to perform the liquidation functions that Findling had been performing. (Trans. 2, pp. 28-29). She further testified that Rite Aid would not have been capable of liquidation of surplus and salvage goods without the assistance and knowledge of a liquidator such as Findling. (*Id.*, p. 30).

**B.    Defendants' Evidence**

Defendants offered both expert witnesses and lay witnesses in support of their positions on the appropriate loss amount.

**1.    Warehouse Managers**

---

[3]  The third party processor who worked at the Carlisle facility paid the rent on the facility, which was then passed on to Rite Aid through the scanning and pallet storage fees. (*Id.*, p. 23).

Findling presented Michael Cruey, a warehouse manager who was employed by Rite Aid's third party processor Inmar, who testified as to the nature and value of the alleged liquidation services provided by Findling and J. Finn Industries.

Cruey testified that his warehouse was regularly in contact with Findling or an employee of J. Finn Industries, on an "at least every other day" basis. (Trans. 1, p. 155). He testified that Findling would physically visit the warehouse about once a quarter or so. (*Id.*). Cruey also stated that Findling would provide boxes for packing material at his cost. (*Id.*). However, on cross, the Government solicited from Cruey that he in fact did not know whether Findling passed on the cost of boxes to the ultimate buyer. (*Id.*, p. 164).

The defense offered into evidence an e-mail from Cruey to Foster, on which Cheryl Hoffman is copied, in which Cruey states that his warehouse team had a "very good working relationship" with Findling and his company and that he "consistently moves freight very quickly for us, which helps us out tremendously." (*Id.*, p. 157). Cruey also authenticated another email from another person involved with the same warehouse, in which the person thanks Findling for "getting those trucks in here this week to clean us up." Cruey further testified that Findling frequently arranged for trucks to help "clean up" the warehouse, so that the warehouse would not run out of space. (*Id.*, p. 158). Cruey also discussed improvements Findling introduced to the warehouse's processes, such as the use of

10

a load out sheet that shows the number of pallets going into a truckload of product. (*Id.*, p. 161). Cruey testified that had Findling not been involved in the liquidation process as he was, detailed above, that Rite Aid would likely have needed to hire someone else or "make other arrangements" "to move the freight." (*Id.*, p. 162).

On cross, the Government asked Cruey about what he thought Findling's relationship was to Rite Aid, and he said the question came up a lot and that he did not know the exact relationship. However, he "knew" Findling was selling the product and "moving it out of the warehouse." (*Id.*, p. 166). He also did not know whether Findling was reimbursed by the ultimate buyer for the trucks involved in cleaning out the warehouses or moving product. (*Id.*, pp. 166-67).

Findling also proffered a certified letter from a supervisor of another warehouse with which Rite Aid contracted, Steven Osbey. In this letter, Osbey stated that he spoke with Findling on a daily basis, and that on the several occasions that Findling came to the warehouse, he would show Osbey's employees how to pack merchandise, load trailers, etc. (*Id.*, p. 170). He further stated that prior to Findling, the warehouse was full of merchandise waiting for disposition, but after Findling got involved, the merchandise was distributed to customers much more quickly. Osbey stated that he thought of Findling as Rite Aid's liquidator. (*Id.*).

### 2.     Jennifer Graef

Graef worked for J. Finn Industries for approximately five years, from 2005-2010. (Trans. 2, p. 44). She testified that during that time period, J. Finn Industries had about five to ten employees, in addition to Findling and his son, John. (*Id.*, p. 45). Graef described her role in the company as basically the office manager and IT person. (*Id.*). She handled a lot of the e-mailing for the company. (*Id.*).

Graef testified that the company "bought an abundance of Rite Aid goods to resell it at J. Finn Industries." (*Id.*, p. 46). She said Rite Aid wasn't their only client, but that it was "by far the biggest." (*Id.*). She testified that she talked to Foster on a daily basis and that he was like a "second boss;" however, she never actually met Foster in person. (*Id.*, p. 47).

Graef provided a detailed overview of the work done by J. Finn Industries with regard to the Rite Aid inventory. For example, she would access inventory lists on Rite Aid's private internet network, and then go through the lists and separate them into categories of various types of products, and look for any discrepancies or problems with the lists. (*Id.*, p. 50). She would also create documents detailing exactly what inventory was contained in a "truckload" of inventory, including identification of pallets in the truckload, and "the summary of the costs and the summary of the retail and then the liquidation." (*Id.*, p. 53). She said that they could not simply use what was contained on the Rite Aid network

because the lists contained many errors and were not categorized in useful ways. (*Id.*, p. 54).

Graef also worked with the warehouses through various troubleshooting issues, such as if there was a missing pallet or if the resale buyer had complaints about the inventory. (*Id.*, p. 58). She testified that Findling would often deal with complaints from the resale buyers, as well, when inventory was damaged or infested with bugs. (*Id.*, p. 60; Def. Ex. JG-9).

Graef also described how Findling and J. Finn Industries managed the resale process, in locating the resale buyer then coordinating the shipping of the inventory to the resale buyer. (*Id.*, pp. 71-73).

On cross examination, the Government challenged Graef's statement that J. Finn Industries "owned" the inventory prior to resale to the ultimate buyers. Graef conceded that she did not "handle the money" and did not know at what point in the process the ultimate buyer paid for the inventory—more specifically, whether J. Finn Industries always paid Rite Aid for the inventory after the inventory had already been sold to the ultimate buyer. (*Id.*, p. 75). The Government was also able to solicit testimony from Graef that the ultimate buyer was billed for the shipping costs. (*Id.*, pp. 83-85; Gov. Ex. 11).

### 3.    Jacques Scambouli

Findling also presented the testimony of Jacques Scambouli, founder and chief executive officer of VIA Trading Corporation, a wholesale salvage goods liquidator. (Transc. 2, p. 80). He has approximately thirteen years of experience in the liquidation industry. (*Id.*, p. 96).

Scambouli testified that he purchased Rite Aid goods from J. Finn Industries, and that if he any problems with the merchandise, he would contact Findling. (*Id.*, p. 97). Scambouli testified that Findling "added value" to the Rite Aid products because he "managed the program," in that he would manage the "sale, the pricing . . . all logistical matters related to shipping the product . . . [and] any issues and claims that could arise . . . .". (*Id.*, p. 98). He also stated that Findling "was known in the industry as the liquidator of Rite Aid products." (*Id.*, p. 103).

On cross, Scambouli testified that generally his company would pay J. Finn Industries for shipping costs. (*Id.*, p. 105).

### 4.    Expert Witnesses

At the hearing, each Defendant offered expert witness testimony to buttress their positions on the loss amount.

### i.   Jonathan Schreibfeder

Foster presented Jonathan Schreibfeder as his expert witness. Schreibfeder is president of Effective Inventory Management, a company which helps manufacturers, distributors, and retailers "get the most out of their investment in stock inventory." (Trans. 2, p. 113).  He testified that Findling's changes to the Rite Aid liquidation process, most notably additional sorts and separate classification of different types of inventory, would add value to the merchandise. (*Id.*). He also testified that when product is properly packaged and properly loaded on trucks, this adds value, as well.

On cross, Schreibfeder admitted that he does not have personal experience with the liquidation of goods. (*Id.*, pp. 119-120). He also conceded that he is not familiar with Rite Aid's liquidation procedures. (*Id.*, p. 121). He further conceded that he had not reviewed the facts of this case. (*Id.*, p. 130).

Schreibfeder testified on the difference between a broker and a liquidator. He testified that a liquidator is someone who actually buys the inventory and then seeks to sell it; thus, a liquidator takes on additional risk due to ownership of the product. A broker, on the other hand, does not buy the inventory but instead is paid a commission to find someone else to buy the inventory. (*Id.*, p. 122). He further testified that the typical commission a broker receives is between 5 to 10%, but that a commission can be much higher depending on the state of the inventory. (*Id.*,

p. 124).  Schreibfeder testified that he did not know whether Findling acted as a liquidator/buyer or broker in the instant matter. (*Id.,* p. 122).

During the hearing and in his post-hearing brief, Findling moved to preclude the testimony of Schreibfeder on the grounds that he did not have pertinent expertise and had not reviewed any underlying data with regard to the instant matter. (Trans. 3, p. 5).[4] We agree that Schreibfeder's testimony was largely irrelevant and unhelpful, given that he conceded that he had no personal experience in the liquidation industry, was not familiar with Rite Aid's liquidation procedures, and had not reviewed the facts of the instant matter. However, as the Government noted and Findling does not appear to specifically contest, Schreibfeder's testimony was useful and reliable to the extent that he provided testimony on the difference between a liquidator and a broker and also on the typical commission a broker receives. Thus, we will only consider in our analysis this limited portion of his testimony.

### ii.    Robert Roberts

Findling presented Robert Roberts as his expert witness. Roberts is the chief executive officer of Channel Control Merchants, ("CCM"), a "market leader in three distinct business segments of the liquidation industry," according to Roberts.

---

[4] As an initial matter, we note that the Federal Rules of Evidence do not apply to sentencing proceedings. FED. R. EVID. 1101(d)(3). Thus, the Rules regarding expert witnesses do not apply in the instant matter. However, evidence must still be considered reliable. *See* U.S.S.G. § 6A1.3(a).

(Trans. 3, p. 39). The Government did not challenge the Findling's offering of Roberts as a qualified expert in the field of liquidation of consumer products. (*Id.*, p. 41).

Based on his review of the documents and data in the instant matter, Roberts opined that "Rite Aid received fair value for their inventory." (*Id.*, p. 51). Roberts also opined that Findling's gross margin for the entire nine year period of approximately 23% was "reasonable recovery on the inventory and also probably at the lower end of the range." (*Id.*). He also stated that his wholesale businesses' margins were significantly higher than Findling's margin on the Rite Aid inventory. (*Id.*, p. 52).

Although Roberts acknowledged that it was difficult to characterize with certainty whether Findling acted as a liquidator or a broker due to a lack of a contract between him and Rite Aid, Roberts ultimately concluded that Findling acted as a liquidator/buyer. (*Id.*, pp. 53-55).

The Government asks the Court to reject the entirety of Roberts' testimony, on the grounds that his company has done significant business with J. Finn Industries and that he has some degree of a personal relationship with Findling. For example, although Roberts claimed he did not deal with Findling specifically, he admitted his company bought surplus Rite Aid goods from J. Finn Industries during some of the years of the Foster/Findling fraudulent scheme. (Trans. 3, pp.

17

73-76). Defense counsel does not appear to contest that Roberts does indeed have a personal and business relationship with Findling but still maintains that Roberts' testimony was credible and impartial. We acknowledge that Robert's background with Findling does give the Court pause. However, we found his testimony with regard to the liquidation industry and the nature of Findling's services to Rite Aid to be credible and fair. There were indeed times when he went out of his way to arrive at opinions and conclusions that were not helpful to Findling's position on the loss amount. For example, as aforementioned, he acknowledged the difficulty in determining whether Findling acted as a liquidator or a broker, when Findling's position that the loss amount is zero essentially turns on whether he is considered a liquidator. Also, Roberts candidly acknowledged that one theory of loss could be the amount of kickbacks Findling gave to Foster as part of the scheme, which Findling refuses to concede. (Trans. 3, pp. 63-64). This honesty bolstered the Court's view of Roberts' credibility and reliability of his testimony. Further, the Government provided no alternative expert witness to challenge much of the substance of Roberts' testimony regarding what is manifestly a very complex industry.

Further, although Roberts' expert report generally concluded that Rite Aid received fair value on its inventories, he conceded on cross that there were some large transactions in which Rite Aid did not in fact receive fair value, such as the

transactions wherein Findling underreported the true sales prices to Foster. (*Id.*, pp. 91-95).This testimony that was clearly adverse to Findling's interests further demonstrates Roberts' reliability and credibility.

Regardless, because we do not agree with Roberts' ultimate conclusion that Findling should be characterized as a pure liquidator/buyer and thus do not agree that he could be entitled to the gross margins at issue, as shall be elaborated upon below, we need not engage in a surgical analysis to determine which particular portions of his testimony, if any, to reject solely on grounds of bias.

## III.   DISCUSSION

The Court need only make a "reasonable estimate" of the loss in the instant matter. U.S.S.G. § 2B1.1, Application Note 3(C). "Rather than measuring the more qualitative categories of criminal culpability and liability as such," a loss calculation during sentencing seeks to "quantify[] the amount of 'harm' wrought against the victim . . . by a particular criminal act." *United States v. Tupone*, 442 F.3d 145, 154 (3d Cir. 2006). "The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's determination is entitled to appropriate deference." *Id.* It is the Government's obligation to establish, by a preponderance of the evidence, the amount of the loss. *United States v. Jiminez*, 513 F.3d 62, 86 (3d Cir. 2008). "Although the burden of persuasion remains with the Government, once the

Government makes out a prima facie case of the loss amount, the burden of production shifts to the defendant to provide evidence that the Government's evidence is incomplete or inaccurate." *Id.*

**A.    Application of *Nagle* and the Sentencing Guidelines to the Instant Matter**

The Third Circuit recently clarified the considerations involved in determining a loss amount in a fraud case in *United States v. Nagle*, 803 F.3d 167 (3d Cir. 2015). At both the hearing and in prior court orders, we made  it abundantly clear to the parties in the instant matter that they should present their cases on the loss amount based on the guidance in *Nagle*.

The defendants in *Nagle* were two co-owners and executives of concrete manufacturing and construction businesses who engaged in a fraudulent scheme with a person of Filipino descent who had a subcontracting business. This person would have his company bid for subcontracts on state transportation projects as a disadvantaged business enterprise, ("DBE"). If his company won the subcontract, the two co-owners of the concrete manufacturing business "would perform all of the work." *Id.* at 171.

There, the district court had found that, under U.S.S.G. § 2B1.1, the defendants were responsible for the face value of the contracts received fraudulently, without any credit for work done on those contracts. *Id.* at 179.The circuit panel disagreed, and held that the amount of loss the defendants were

responsible for was the face value of the contracts received fraudulently "minus the fair market value of the services they provided under the contracts." *Id.* at 180. The panel followed Application Note 3(E)(i), which states that "the fair market value of the property returned and the services rendered, by the defendant or other persons activing jointly with the defendant, to the victim before the offense was detected shall be credited against the loss." *Id.* at 181-82. The panel elaborated that the "fair market value of services rendered" can include such expenses and services as "the fair market value of the materials supplied, the fair market cost of the labor necessary to assemble the materials, and the fair market value of transporting and storing the materials." *Id.* at 183.

In the matter *sub judice*, the Government argues that *Nagle* only requires very simple arithmetic: the difference between the ultimate amount the Government alleges Findling received on the contracts with the ultimate buyers, ($132,301,514), and the amount Foster reported and Findling paid to Rite Aid, ($102,576,432). Thus, the Government asserts that the loss amount to Rite Aid is $29,725,082, without any accounting for the alleged liquidation or broker services provided by Findling and his company. Defendants, on the other hand, argue that the Court's loss computation must take into account the fair market value of the liquidation services provided by J. Finn, Industries.

We find the Government's interpretation of *Nagle* patently out of sync with the clear language of the panel's holding, which requires any loss figure to take into account—to essentially subtract—the "fair market value of services rendered" by the perpetrators of the fraud. Having suffered a reversal in *Nagle*, it is indeed somewhat strange that the Government studiously ignores this clear legal framework. Because of this misinterpretation of precedent, the Government's estimate of the ultimate loss amount in the instant matter is fundamentally flawed.

However, the Government does ultimately address *Nagle's* requirement for credits for services rendered by arguing that Findling has not shown his services in fact added any real value to Rite Aid at all. Specifically, the Government argues that Cheryl Hoffman's testimony refuted Defendants' position that Findling's salvage expertise added value to the company's returns. As aforementioned, Hoffman testified that Findling influenced Rite Aid to increase its product sorts, but that she was never able to validate that this strategy led to any corresponding increase in the company's revenue. (Trans. 3, pp.12-15). The Government further argues that, assuming *arguendo* Findling rendered services to Rite Aid and that the services in fact generated additional revenue, this additional revenue only accrued to Defendants and not to Rite Aid.

Despite the Government's wishes, this Court cannot ignore the clear evidence that Findling provided valuable services to Rite Aid by aiding the

company in the liquidation of over a hundred million dollars' worth of surplus inventory. The testimony showed that Findling and his company were actively involved in the liquidation of Rite Aid's inventory. Indeed, according to Jennifer Graef's testimony, it is apparent that most of J. Finn Industries' business revolved around its role in liquidating Rite Aid inventory, as Rite Aid was the company's biggest client. The Government essentially floats a red herring argument that the Court should ascribe no value to the services provided by Findling and his company because some of Findling's liquidation strategies may not have in fact been strategically and financially best for Rite Aid. However, that does not mean that Findling and his company did no work at all for Rite Aid. It is beyond peradventure that Findling rid Rite Aid of millions of dollars of difficult product, and Rite Aid was apparently happy with Findling's services and the rate of return on their inventory for approximately nine years. The Government's version of events essentially writes Findling out of Rite Aid's liquidation process during those nine years, despite the testimony from Jennifer Graef and Michael Cruey detailing just how involved he and his company were. The Government's position does not even account for providing Findling a broker fee for any of the third party transactions with which he was indisputably involved. In sum, the Government is asking the Court to find that Findling aided Rite Aid in the liquidation process for free. *Nagle* does not permit us to do so.

Moreover, even though the Government relies on Hoffman for the proposition that Findling provided no value to Rite Aid, Hoffman herself testified that after Findling no longer worked with Rite Aid, Rite Aid had to hire someone else to perform the liquidation services Findling had been providing. Indeed, she testified that Rite Aid would not have been capable of liquidation of its surplus goods without Findling. This is convincing evidence that Findling provided quite substantial value, in the form of liquidation services, to Rite Aid.

Even the Government's main witness, David Clark, acknowledged that his investigation revealed that prior to Findling's involvement, Rite Aid's liquidation process was inefficient and chaotic, and that Findling's sorting strategies improved the process and increased revenue. (Trans. 1, pp. 114-115).

Additionally, the Government's argument that the Court should not ascribe value to Findling's services to Rite Aid because the additional revenue from his services never accrued to Rite Aid and only benefited Defendants similarly misses the mark. There is no disagreement that Findling and Foster pocketed some of the revenue from sales to the third party buyers instead of remitting all revenue from the sales back to Rite Aid. The purpose of the hearing was to determine how much of that difference between what Defendants remitted to Rite Aid and what they kept for themselves should be construed as a loss to Rite Aid. The Government's

argument again fails to address the key issue—the fair market value of Findling's services to Rite Aid.

**B.     Estimation of the Fair Market Value of Findling's Services to Rite Aid**

Given the foregoing, our task at this juncture is to reasonably estimate the fair market value of the services provided by Findling and his company to Rite Aid. It is difficult for us to do so, for a number of reasons. First, because the Government's position is that Findling's services did not provide any value at all, the Government has elected not to provide the Court with a numerical estimate of the fair market value of Findling's services (other than "zero"). The Government also failed to present an expert witness in the field of liquidation to aid in its case. Additionally, it is problematic for the Court to quantify the fair market value of Findling's services because of the parties' disagreement over whether Findling acted more as a broker or as a liquidator/buyer of Rite Aid's surplus inventory. Because Rite Aid had no written contract with Findling, Rite Aid's intended role for Findling in the liquidation process is not clear.

As an initial matter, there appears to be no dispute between the parties that a typical broker only negotiates sales between a seller and buyer, and does not aid in the liquidation of inventory in any other way.  According to the testimony, a broker typically charges his client a commission of 5-10% , measured against the sale price of the inventory to the ultimate buyer. It is less clear how to appropriately

define a liquidator. There was testimony from Schreibfeder that a liquidator actually buys the inventory himself. The Government's view appears to be that this fact is what defines a liquidator—the buying of the inventory and thus taking on that additional risk. Findling also appears to agree that a distinguishing difference is ownership. Roberts' expert report presents the relevant distinction in the liquidation industry as whether a person or company is acting as a buyer/principal or as an agent. (Ex. RR-1, pp. 5-6). Roberts' expert report also states that a liquidator acting as a buyer or principal typically incurs expenses such as warehousing costs for inventory, transportation costs, temporary storage fees, and costs of shipping supplies. (*Id.*, p. 8). His report further states that liquidators are expected to "bear these costs as an operating expense unless the liquidator is retained on an entirely agency relationship basis." (*Id.*).

Findling also suggests that a liquidator is someone who provides services related to the disposition of surplus inventory—services that relate to the execution of the sale and transfer of goods from the seller to the ultimate buyer. (Doc. 93, pp. 5-6).

Based on the evidence and testimony presented at the hearing, this Court finds that the most fair and reasonable way to characterize Findling and his company's services to Rite Aid is as a hybrid broker/liquidation service. The evidence is clear that Findling did more than locate and contact third party buyers

and sell Rite Aid products to them, as a broker would do. Findling and his company were also heavily involved, on a nearly day to day basis, with the processing and sorting of Rite Aid surplus inventory, the moving logistics of inventory from Rite Aid warehouses (even if Findling did not personally pay for shipping costs), helping with troubleshooting issues with the liquidation of the inventory, and dealing with complaints from the third party buyers. Jacques Stambouli's testimony that Findling was known in the industry as the liquidator of Rite Aid products was also undisputed. Based on our comprehensive review of the testimony, we find it abundantly clear that Rite Aid heavily depended on Findling and his company to help dispose of its surplus inventory, beyond just the pure negotiating of sales that a broker would do. Moreover, if Rite Aid only considered Findling to be a broker, one would expect that Rite Aid would have negotiated a contract with a commission with him, as is standard practice for broker contracts. However, Rite Aid never arranged for such a contract with Findling for any of the hundreds to over a thousand surplus inventory sales transactions with which he was involved that are under review in this case.[5]

However, we do not find it fair or reasonable to characterize Findling as a pure liquidator or buyer. Findling's own expert stated that it was difficult to conclusively determine whether he should be considered a liquidator of Rite Aid

---

[5] There is evidence that Foster negotiated some of the sales transactions independently from Findling. (Transc. 1, pp. 21-22).

inventory. As the Government argued, it appears that Findling was never truly "at risk," as a true buyer or liquidator would be, in that he only paid Rite Aid for the inventory once he had negotiated a sale for a higher amount with a third party buyer. (Graef testimony, Trans. 2, pp. 77-78). Findling basically guaranteed himself a profit on the inventory—Findling did not point to a single transaction in which he lost money.[6] Furthermore, it appears that J. Finn Industries did not incur many of the typical expenses it should have if it were a pure liquidator of Rite Aid's products. There is no evidence, for example, that J. Finn Industries incurred any warehousing costs, transportation costs, temporary storage fees, shipping costs, or insurance costs with regard to the Rite Aid inventory.[7] Lastly, Findling rarely took possession of any inventory because it was shipped directly from Rite Aid's warehouses to the third party buyer. (Graef testimony, Trans. 2, p. 80). This fact also weighs against finding Findling to be a buyer or liquidator.

Indeed, part of the difficulty in characterizing Findling's role in relation to Rite Aid is due to the nature of the underlying fraud itself. With apparently little to

---

[6] We also specifically note that Findling presents no evidence that he was ever not paid the amount he negotiated with the third party. In other words, he never had any exposure to a risk of losing money on a contract due to nonpayment on a contract by the ultimate buyer. Indeed, the Government appears correct that Findling only transferred money to Rite Aid once he received payment from the ultimate buyer. (Doc. 92, p. 3).

[7] Roberts' expert report makes the inference that most of J. Finn Industries' business expenses, such as warehouse rent, shipping costs, and storage fees, were incurred based on its Rite Aid business, but Findling offered no evidence during the hearing of these expenses. For example, there is no convincing evidence that Findling ever transported any Rite Aid goods to his own warehouses on their way to third party buyers, or that he or his business ever paid for shipping expenses for Rite Aid inventory.

no oversight from Rite Aid, Foster and Findling crafted a fraudulent scheme in which Findling was guaranteed to make a profit. Thus, it would be inequitable and unjust to essentially give them a benefit based on their fraudulent relationship by characterizing Findling as a true buyer or liquidator. Moreover and as noted, the facts do not support such a finding by this Court.

The nature of the fraudulent scheme provides us with the rationale for not placing conclusive weight on Roberts' opinion that Findling acted as a principal or liquidator. In the absence of a contract between Findling and Rite Aid defining the relationship, Roberts looked to the "circumstantial evidence and the general understanding of the parties" to decide the issue. (Trans. 3, p. 53). Roberts considered in his analysis the fact that apparently many Rite Aid officials thought Findling was buying the inventory. However, even if there was evidence that Rite Aid officials generally thought Findling was buying the product, they certainly did not know that Findling only decided on a price for the Rite Aid product once he had made a sale for a higher price to a third party buyer. Similarly, if Rite Aid's accounting of its relationship with Findling is more indicative of a liquidator relationship, in that the company's accounting shows no payment of a broker commission, that still does not mean they were aware of, much less approved of, Foster's scheme with Findling permitting him to send back arbitrary amounts to Rite Aid once Findling had already negotiated a higher amount with a third party

and received payment on the inventory. At the end of the day, we are tasked to apply our common sense to this conundrum. Whatever the "general understanding" of the parties involved was, Rite Aid's understanding was certainly not based on an awareness it was being defrauded.

Given our finding that Findling's services are best characterized as a hybrid cross between broker and liquidation services, our next task is to decide the appropriate fair market value of this service.[8] Defendants have met their burden of production in providing this Court with evidence of the services rendered by Findling in helping with the disposition of Rite Aid inventory. *See United States v. Fumo*, 655 F.3d 288 (3d Cir. 2011) (noting shifting of burden of production to defendant to provide evidence challenging the Government's loss amount). However, Findling's estimate of the fair market value of his services is wholly unconvincing. First, Findling argues based on Roberts' testimony that there was in fact no loss because Rite Aid received "fair value" for its inventory based on its recovery rate. However, this is not the inquiry under *Nagle* and thus merely presents another flavor of red herring—we are only concerned with the fair market value of the services providing by Findling and his company, not whether the recovery rate was fair.

---

[8] Even though it is useful for our analysis, we note that it is not crucial under *Nagle* or the Sentencing Guidelines for the Court to "correctly" characterize Findling as a broker or liquidator. What matters is that we account for the fair market value of the services he actually provided to Rite Aid.

Relatedly, Findling argues, based on Roberts' testimony and expert report and the testimony of his lay witnesses, that the Government's proposed loss amount of approximately $29 million, or the "gross margin" Findling received on the inventory, could reasonably be construed as fair compensation for his liquidation services. However, this argument is premised on Findling and Roberts' view that Findling should be considered a buyer or pure liquidator, a view which we have already rejected.

Consequently, neither party provides the Court with a compelling position on the credits against the loss amount that Findling should receive for his services. Accordingly, the Court shall arrive at its own estimate of the fair market value of Findling and his company's services, based on the evidence in the record.[9]

---

[9] There is some dispute among the parties as to whose burden it is to prove "credits against loss." This Court is unable to find specific Third Circuit precedent bearing on this issue, nor do the parties cite to any such precedent. Some other circuit courts appear to implicitly suggest that it is the defendant's burden to prove credits against loss. *See, e.g., United States v. Liveoak*, 377 F.3d 859, 867 (8th Cir. 2004) (discussing defendant's evidence offered with regard to proposed credit and rejecting it). In one Third Circuit case, the panel does appear to discuss credits against loss as a credit a defendant seeks, rather than a credit the Government must prove. *United States v. Sharma*, 190 F.3d 220,229 (3d Cir. 1999) (". . . the trial judge [] committed no error in denying, after careful consideration, all three of the credits that the defendants sought.")

The case law is clear that the burden of persuasion rests with the Government in proving the loss amount; however, we find it unclear under *Nagle* and U.S.S.G. § 2B1.1, Note 3(E) as to whose burden it is to prove credits *against* "loss." Ultimately, we do not agree with Findling that proof of loss amount itself by the Government implicitly requires the Government to prove credits against the loss. First, Note 3(E), in describing "credits against loss," states that "loss shall be reduced by the following . . ." This would appear to imply that an initial loss determination is separate from a later determination of credits against loss. Second, as a matter of common sense, it is logical that a defendant would have some evidentiary burden to prove the fair market value of his own services as an offset against the Government's proposed loss amount.

The undisputed evidence in the record is that a broker typically earns a 5-10% commission, based on the sale price of the inventory. However, as we have discussed, Findling acted as more than a pure broker during the course of the fraudulent scheme. During the hearing, the Court asked Roberts what another person acting in the role of Findling could expect to receive as a reasonable profit or net margin percentage. Roberts candidly responded that if someone is in a position in the market as a "master liquidator," such as Findling, then the profit or margin he could expect could be in the "high teens" and up to 20%. (Trans. 3, pp. 112-113).[10]

Findling's response as to what a "master liquidator" should expect to receive as a kind of gross margin or profit is very helpful, as it provides a counterpoint to the typical commission range a broker generally receives. Given that we have decided to construe Findling's services as a hybrid of typical broker and liquidator services, we find that a reasonable estimate of the fair market value of his services is an approximate midpoint of the two ranges. We thus conclude that a 14% commission, or gross margin, is a fair and reasonable percentage to represent the fair market value of Findling and J. Finn Industries' extensive services to Rite Aid, based on all the evidence in the record. Given that the total amount Findling

---

[10] We suspect that this was one more occasion at which Findling was surprised and chagrined by his own expert's testimony, but in the end it bolsters our view of Roberts' credibility.

received on the third party sales transactions has been established to be

$132,301,514, a 14% commission on that amount comes to $18,522,212. [11] [12]

Additionally, we do not find that the record establishes Findling should

receive any credits for expenses. With regard to possible shipping expenses, as the

Government notes, Jennifer Graef admitted in her testimony that the Rite Aid

inventory "never came to Jay in New Jersey. It went directly from the (Rite Aid)

warehouse to the real buyer." (Trans. 2, p. 80). Roberts also did not see any record

of Findling not being paid for shipping expenses with regard to Rite Aid inventory.

(Trans. 3, p. 101). Lastly, the J. Finn Industries invoices to the third party buyers,

marked Government's Exhibit 11, clearly show that the buyers were charged for

shipping and handling expenses. Thus, we have no evidence to support Defendants

receiving a credit against the Government's proposed loss amount for shipping

expenses. Findling does not appear to seek credits for any other form of expenses

in his post-hearing brief.

---

[11] We acknowledge that this "commission" is based on taking all of the sales transactions in the aggregate, and does not take into account, for example, any transactions in which Findling skimmed a particularly egregious amount. However, we find that this is the most reasonable way we can estimate the fair market value of Findling's services, especially given the fact the Government provides no plausible number of its own. Again, the Guidelines do not require us to arrive at an exact loss amount.

[12] This valuation of Findling's services also takes into account the fact that he did not act as a broker in all transactions. (Trans. 1, pp. 20-21). In other words, Foster made some of the sales without Findling's involvement and thus, in the Government's view, Findling did not render a service on those transactions. However, this not does mean Findling did not provide liquidation services on those same transactions. The record reflects Findling provided liquidation services throughout the entire nine year period of the scheme.

**C.     Whether Foster Should Receive Credits Against Loss for Services Rendered**

We shall not provide any credits against the loss for services provided to Rite Aid by Foster. Foster concedes that the total amount of kickbacks he received was a loss to Rite Aid. (Doc. 94, p. 2). Foster received a salary and other forms of compensation throughout his employment with Rite Aid, (Gov. Ex. 10); thus, he has already been compensated for the fair market value of his services to Rite Aid.

**D.     Foster/Baser Scheme**

Turning to the Foster/Baser scheme, the Government states that this scheme was completely separate from the Foster/Findling scheme and that Baser and Findling did not know one another. (Doc. 92, p. 2). The uncontested evidence in the record is that Baser and Foster skimmed $1,768,765 from their sale of surplus Rite Aid goods. Foster presented no evidence to support any kind of credits against this amount for the market value of Baser's services, and no evidence has been presented in the record of what the exact nature of Baser's services, if any, were. And again, Foster is not entitled to any credits for his services rendered because he was already compensated by Rite Aid with a salary and other financial benefits. Thus, we find the loss amount attributable to the Foster/Baser scheme to be $1,768,765.

It is unclear based on the briefing whether the Government is attempting to hold Findling responsible for the loss attributable to the separate Foster/Baser

scheme. In any event, we see no reason why Findling should be held responsible, and will not so find.

### E.    Final Calculation of Loss Amount

Based on the foregoing painstaking analysis, we shall now calculate the final loss amount in the matter *sub judice*. The Government has proven an initial amount of loss of $29,725,082 due to the Foster/Findling scheme, which again was simply the difference between the total amount Findling received on the third party sales transactions and the total amount Foster reported and Findling paid back to Rite Aid for the inventory. We shall then subtract the fair market value of Findling's services from that amount, as a credit against the loss. Thus, we subtract $18,522,212 from $29,725,082, bringing us to a final loss to Rite Aid of $11,202,870 attributable to the Foster/Findling scheme.

As discussed, Foster is additionally responsible for a loss of $1,768,765 to Rite Aid due to his criminal scheme with Baser. Thus, the total loss amount to Rite Aid for which Foster is responsible, inclusive of the loss from the Foster/Findling scheme, is $12,971,635.

## IV.   CONCLUSION

For all the reasons detailed hereinabove, we shall sustain Defendants' objection to the loss amounts contained in the PSRs. As aforementioned, we find a reasonable estimate of the total loss to Rite Aid due to the Foster/Findling scheme

to be $11,202,870. Adding the loss due to the Foster/Baser scheme to this amount, we find Foster responsible for a total loss of $12,971,635 to Rite Aid.

Our path to resolve this matter was made infinitely more difficult due to the divergent and unrealistic positions taken by the parties. Rite Aid's poor internal controls, including its failure to engage in a written contractual relationship with Findling, and the Government's failure to provide its own plausible estimate of the fair value of the services rendered by Findling and J. Finn Industries based on a proper understanding of the guidance in *Nagle*, created the Gordian knot that we have labored to untie. While we recognize that our conclusions will likely leave all parties somewhat unhappy, we are satisfied that it represents a fair and just arbitrament of this hotly disputed issue.

**NOW, THEREFORE IT IS HEREBY ORDERED THAT:**

1.  Defendants' objection to the Government's loss amount, and thus the loss amount reflected in the Presentence Reports, is **SUSTAINED**. The Court determines that a reasonable estimate of the total loss to Rite Aid due to the Foster/Findling scheme is $11,202,870. This is the total amount for which Defendant Findling is responsible.

2.  The total loss to Rite Aid due to the Foster/Baser scheme is $1,768,765. Thus, adding the two schemes together, Defendant Foster is responsible for a total loss of $12,971,635 to Rite Aid.

3.      The Probation Officer shall prepare addenda to the Presentence

Reports that recalculate the sentencing guideline ranges for

Defendants.

4.      A telephonic conference call is **SCHEDULED** for Wednesday, July

27, 2016, at 2:00 p.m. Counsel for the Government shall initiate the

call to chambers at 717-221-3986. At the time the call is placed, all

counsel shall be on the line and prepared to proceed. Counsel shall be

prepared to discuss any remaining issues regarding sentencing.


                                        s/ John E. Jones III
                                        John E. Jones III
                                        United States District Judge